**COOPERATIVE CENTRALE RAIF-FEISEN–BOERENLEEN BANK B.A., Plaintiff,**

**v.**

**NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, WISCONSIN, Defendant.**

**No. 91 Civ. 2119 (RPP).**

United States District Court, S.D. New York.

Nov. 19, 1991.

Ferber Grilsheimer Chan & Essner, New York City by Robert N. Chan, for plaintiff.

Werner & Kennedy, New York City by Austin V. Campriello, for defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

In this action a bank sues to recover on a surety bond due to the default of a limited partnership in making payments of interest and principal on a loan. Plaintiff moves for summary judgment under Fed.R.Civ.P. 56. Defendant has filed a cross-motion to stay this action pending the outcome of parallel litigation in the United States District Court for the Eastern District of Wisconsin. For the reasons set forth in this opinion, plaintiff's motion is granted in part and denied in part, and defendant's motion is denied.

## BACKGROUND

### A. Procedural history

Plaintiff Cooperative Centrale Raiffeisen–Boerenleen Bank B.A. ("Rabobank") is a cooperative association chartered as a bank under Netherlands law and authorized to do business in New York. Defendant Northwestern National Insurance Company ("NNIC") is a Wisconsin corporation with its principal place of business in Wisconsin.

On March 6, 1991 NNIC filed a declaratory judgment suit against Rabobank in the United States District Court for the Eastern District of Wisconsin. *Northwestern Nat'l Ins. v. Rabobank Nederland,* No. 91–C–426 (SBN). Several weeks later, on March 28, 1991, Rabobank filed suit against NNIC in this Court seeking damages. This second suit is based on the same transactions and calls for a determi-

nation of the same issues as the suit filed in Wisconsin.

At a pre-trial conference held by this Court on July 1, 1991, NNIC asked the Court to hold this matter in abeyance pending the outcome of the parallel Wisconsin litigation. Because it was unclear whether the Wisconsin court had jurisdiction over the parties, NNIC's request was denied. After the July 1 pre-trial conference, the Wisconsin court issued an opinion in which it (1) accepted jurisdiction over the parties, and (2) denied without prejudice Rabobank's motion to transfer the case to this Court because Rabobank had failed to indicate the residences of the likely witnesses in the action. *Northwestern Nat'l Ins. v. Rabobank Nederland,* No. 91–C–426 (SBN), 1991 WL 284552 (E.D.Wis. September 26, 1991).

Discovery in this action has been limited by agreement to the exchange of documents, and this exchange has been completed. Plaintiff moves for summary judgment based on that discovery.

### B. Factual background

On December 21, 1984, 17 individuals (the "Limited Partners") invested in a limited partnership known as "Beefmasters," the purpose of which was to breed and sell livestock. Each Limited Partner purchased his participation interest by paying a sum in cash and delivering a six-year promissory note ("Investor Note") with payments of 13.5% interest due quarterly and a balloon payment of principal due on December 21, 1990. Jones Aff., Exh. 3.

The Limited Partners made their investments based on a private placement memorandum of June 21, 1984 ("Offering Memorandum"). Jones Aff., ¶ 10, Exh. 4. Pursuant to the Offering Memorandum, Beefmasters was to secure a loan from a bank and purchase certificates of deposit which, by the end of the term of the Investor Notes, would accrue interest such that their redemption value and interest would approximate the principal amounts of the Investor Notes.

The Offering Memorandum provided that each Investor Note was to be secured by a

pledge of the Limited Partner's participation interest. Jones Aff., Exh. 4. Furthermore, to secure payment of his or her Investor Note, each Limited Partner would also (1) apply for an investor surety bond, and (2) execute the Pooled Non-discretionary Grantor Trust Agreement ("Trust Agreement"). The Trust Agreement provided that a trustee would be named to hold the certificates of deposit and the interest thereon in trust until the Investor Notes matured and then apply the proceeds to the remaining principal on the Investor Notes. Jones Aff., Exh. 4 at 34. As noted in the Offering Memorandum, the principal and accumulated interest on the certificates of deposit:

> will be held in trust until the due date of the Note or a lender certified acceleration of principal, at which time the trust will terminate, and *the funds therein will be applied to the remaining principal.*

Jones Aff., Exh. 4 at 34 (emphasis added).[1]

NNIC issued an investor surety bond ("Surety Bond") naming Beefmasters as beneficiary and Rabobank as a permitted assignee. Jones Aff., Exh. 7. NNIC contends that it relied on the provision in the Offering Memorandum regarding the use of the proceeds of the certificates of deposit in assessing the risks involved in issuing the Surety Bond. An NNIC officer involved in issuing the Surety Bond states that:

(1) the Trust Agreement, as contained in the Offering Memorandum, was an essential element in inducing NNIC to issue the Surety Bond;

(2) that the premium charged on the Surety Bond reflected the fact that the Offering Memorandum and the Trust Agreement required the Trust Funds to be so applied; and

(3) that had there been no Trust Agreement, the premium charged would have been higher, or the Surety Bond would not have been issued in the first place.

Affidavit of Harold Recard, sworn to on September 11, 1991 ("Record Aff.") ¶¶ 3–6. NNIC also states that it relied on the statement in the Offering Memorandum and attached draft Trust Agreement that by the time the Investor Notes came due in 1991, the accumulated Trust funds would be almost exactly enough to cover the amount due under the Investor Notes, i.e. $2,775,000. Jones Aff. ¶ 17.

On December 21, 1984, each Limited Partner delivered cash and his Investor Note to Beefmasters, and NNIC issued its Surety Bond covering all of the financial commitments of the Limited Partners. On the same day, Rabobank and Beefmasters entered into a Term Loan Agreement ("Loan Agreement") backed by a "Pledge Agreement" and a "Security Agreement." Pursuant to the Loan Agreement, Rabobank loaned Beefmasters $2,775,000 and Beefmasters executed a "Partnership Note" in the amount of $2,775,000 with principal due on December 21, 1990 and interest payable annually. Affidavit of Michel de Konkoly Thege, sworn to on August 8, 1991 ("Thege Aff. 1"), ¶¶ 5–6. The Loan Agreement required that the funds obtained through the Loan be used by Beefmasters to purchase from Rabobank:

(1) a note payable to Beefmasters in the amount of $1,320,000, 13% interest, maturity on December 21, 1990;

(2) a promissory note payable to Beefmasters in the amount of $240,000, 9⅞% interest, maturity on December 21, 1985;

(3) a promissory note payable to Beefmasters in the amount of $240,000, 9⅞% interest, maturity on December 21, 1986.[2]

Jones Aff. ¶ 23. The Loan Agreement also required Beefmasters to make five interest payments to Rabobank on each December

---

1. The projections of Singleton & Singleton, accountants for Beefmasters, also stated that the certificates of deposit would be used to pay off the principal balance of the Investor Notes. Jones Aff., Exh. 4 at B–10.

2. The remaining $975,000 was to be used as Beefmasters for working capital.

21 during the period the loan was outstanding.[3] Thege Aff. 1, ¶ 6.

The Pledge Agreement, pursuant to which Beefmasters pledged and assigned the Investor Notes to Rabobank, provided that in the event of a default in the Loan by Beefmasters:

> Any cash held by the Bank as Pledged Collateral and all cash proceeds received by the Bank ... may, in the discretion of the Bank, be held by the Bank as collateral for, and/or then or at any time thereafter *applied ... in whole or in part by the Bank against, all or any part of the Obligations in such order as the Bank shall elect.*

Thege Aff. 1, Exh. E. at 5 (emphasis added). In the Security Agreement, Beefmasters assigned to Rabobank as security for the Loan its rights under (1) the Surety Bond obtained from NNIC, (2) the $1,320,000 promissory note issued by Rabobank, and (3) the two $240,000 promissory notes issued by Rabobank. Thege Aff. 1, ¶ 12. The Security Agreement gave Rabobank rights similar to those provided for in the Pledge Agreement; Rabobank could apply any proceeds seized pursuant to a default by Beefmasters "against, all or any part of the Obligations in such order as the Bank shall elect."[4] Thege Aff. 1, Exh. G at 5.

As noted above, the Loan was structured so that the $240,000 promissory notes issued by Rabobank to Beefmasters were utilized to assure partial satisfaction of the interest payments to be due on the Partnership Note during its first two years. However, interest rates were higher than projected, and by 1986, Beefmasters had fallen behind in its interest payments by about $100,000. Jones Aff., ¶¶ 27–29. This deficit of interest accumulated additional interest during the term of the Loan. Jones Aff., ¶ 32. Furthermore, during the 1987–1990 period, the Limited Partners failed to make any of their required quarterly interest payments on the Investor Notes. As a result, Rabobank sent default notices to NNIC, and upon receipt, NNIC, as Beefmasters' suretor, submitted payments sufficient to cure the Limited Partners' defaults on their interest payments. Thege Aff. 1, ¶¶ 19–20.

On December 21, 1990, the maturity date of the Investor Notes, the Loan also came due. At that time, there was due to Rabobank $2,775,000 in principal and, $331,624.74 in interest on the Partnership Note. Beefmasters did not make any payments to Rabobank. Thege Aff., ¶ 24. Accordingly, Rabobank resorted to its collateral and applied the proceeds of Rabobank's maturing $1,320,000 note, then totalling $2,774,969.44, to Beefmasters' outstanding obligations under the Loan. Thege Aff. ¶ 26. Rabobank applied the funds to first pay off the unpaid interest and then to pay off the principal due under the Partnership Note. Rabobank claims that it is still owed $331,624.74 [5,6] under the Loan, and that it holds the Investor Notes and the Surety Bond as security for payment of the Loan. Because the Limited Partners are in default on their principal payments and final interest payment under the Investor Notes, Rabobank claims that NNIC, as suretor for such payments, owes this balance. Thege Aff. 1, ¶¶ 25–27.

NNIC argues that terms of the Offering Memorandum and the attached draft Trust Agreement required Rabobank, as assignee of Beefmasters, to apply the $2,774,969.44, the proceeds of the $1,320,000 promissory note, first toward payment of the principal due on the Investor Notes, but that in violation of this requirement Rabobank applied these funds first to the accumulated interest on the Loan. Jones Aff., ¶ 38. NNIC alleges that the money Beefmasters

---

**3.** The notes payable on December 21, 1985 and December 21, 1986 insured that Beefmasters would meet the first two of these interest payments.

**4.** "Obligations" is a defined term meaning any and all obligations of Beefmasters now or hereafter existing under the Loan Agreement or Pledge Agreement.

**5.** This figure includes the $224,212.24 owed on the Loan and the final payments of interest due on the Investor Notes which totalled $87,412.50.

**6.** This figure includes the $244,212.24 outstanding on the Loan as of December 21, 1990 and the $87,412.50 final payment of interest on the Investor Notes.

owed Rabobank was not principal, but rather unpaid interest on the Partnership Note for which NNIC has no obligation as suretor. Jones Aff., ¶ 39. According to NNIC, since it only guaranteed the Limited Partners' unpaid obligations and since the proceeds of the $1,320,000 note were required to be used to pay off the principal on the Investor Notes, NNIC owes only the difference between $2,775,000 and $2,774,969.44, or about $31. Jones Aff. ¶ 42. Rabobank, however, relies on the terms of the Security Agreement which permitted it to apply the $2,774,969.44 to the total of Beefmasters' obligations under the Loan in whatever order it saw fit. Thege Aff. 2, ¶ 14.

Rabobank also asserts a separate claim against NNIC for $87,412.50.[7] This figure represents the total of the final interest payments on the Investor Notes which were due on December 21, 1990. The Limited Partners, as they had on the 16 previous quarterly payments, defaulted on this final payment. On January 20, 1991, Rabobank sent NNIC a default notice. In contrast to its payments for the previous instances of default by the Limited Partners, NNIC refused to pay Rabobank for this default. Thege Aff. 1, ¶¶ 22–23. NNIC claims that because none of the Investor Notes required any payments after the termination date of the Surety Bond, and because the Investor Notes specifically required payments of interest due thereon to end on December 21, 1990, NNIC has no obligation to pay Rabobank. Jones Aff. ¶ 46.

## DISCUSSION

### A. Motion to stay this action

■ The "first filed rule," a long standing rule of decision in the Second Circuit, dictates that when there are two competing lawsuits, the first suit filed should have priority absent a showing of a balance of convenience or special circumstances giving priority to the second. *Employers Ins. of Wausau v. Prudential Ins. Co.*, 763 F.Supp. 46, 48 (S.D.N.Y.1991), *citing First City Nat'l Bank & Trust Co. v.*

*Simmons*, 878 F.2d 76, 79 (2d Cir.1989). The first filed rule is not to be applied in a mechanical way, *Brierwood Shoe Corp. v. Sears Roebuck & Co.*, 479 F.Supp. 563, 568 (S.D.N.Y.1979), *citing Hammett v. Warner Bros. Pictures, Inc.*, 176 F.2d 145, 150 (2d Cir.1949), and courts have recognized several "special circumstances" which warrant exception to the rule. One such circumstance occurs when a party files suit seeking a declaratory judgment immediately after receiving notice of a planned suit from the other party, thus winning a "race to the courthouse." *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir.1978), *cert. denied* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979), *citing Perez v. Ledesma*, 401 U.S. 82, 119 n. 12, 91 S.Ct. 674, 694 n. 12, 27 L.Ed.2d 701 (1971) (Brennan, J., dissenting) (noting that "[t]hat the federal declaratory judgment is not a prize to the winner of the race to the courthouse"). A second recognized "special circumstance" is the situation where the later filed suit has moved further along the road to trial than the first filed suit. *Connors v. Lexington Ins. Co.*, 666 F.Supp. 434, 455 (E.D.N.Y.1987).

■ Although the action in Wisconsin was filed before the action here, a departure from the first filed rule is warranted. In a letter dated January 20, 1991, Rabobank sent NNIC a notice of default demanding payment for $244,212.44 in unpaid "principal" and $87,412.50 in interest owed. Thege Aff. 1, Exh. M. Although the letter did not threaten imminent litigation, it notified NNIC of the manner in which Beefmasters' funds were credited to its outstanding obligations and demanded payment of the $244,000, thus giving NNIC notice of the substance of this dispute. Shortly thereafter, on March 6, 1991, NNIC filed suit seeking a judgment declaring that Rabobank had wrongly credited Beefmasters' sums. These facts support the inference that NNIC filed its declaratory judgment action knowing it did not intend to pay the sums demanded in Rabobank's January 20 letter and anticipating that Rabobank would sue to collect. In such a cir-

---

**7.** The $331,624.71 due on the Loan referred to earlier includes the $87,412.50 referred to here.

cumstance, the first filed rule should not be mechanically applied.

Here, the parties have conducted substantial discovery, and they have briefed and argued a motion for summary judgment. As of the date of the oral argument on this motion, Rabobank had not even filed its answer in the Wisconsin action. Under these circumstances, considerations of judicial economy and efficiency warrant an exception to the first filed rule.

In light of these considerations, this Court will not hold this matter in abeyance pending resolution of the Wisconsin action merely because it was filed several weeks earlier. Accordingly, the Court proceeds to consider Plaintiff's motion for summary judgment.

## B. Motion for summary judgment

Rabobank moves for summary judgment on its claims for $244,212.24 in unpaid principal and $87,412.50 in unpaid interest on the Investor Notes. To grant a motion for summary judgment, a court must find (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to judgment as a matter of law because, after sufficient time for discovery, the non-moving party has not made a sufficient showing of an essential element of its case as to which it has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if the evidence offered demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden

rests on the moving party to demonstrate the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and the Court must view the facts in the light most favorable to the non-moving party. *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985).

### 1. *Rabobank's claim for unpaid principal*

NNIC's principal argument in opposition to summary judgment is that the Rabobank improperly applied Trust funds to the unpaid accumulated interest on the Loan with Beefmasters rather than to the remaining principal on the Investor Notes. Jones Aff., ¶ 38. NNIC argues that it relied on the terms of the Offering Memorandum of and the draft Trust Agreement[8] attached thereto, which it states required Rabobank as assignee to apply the Trust funds against the principal outstanding on the Investor Notes before Rabobank could require NNIC to answer for any principal owed on the Investors Notes. Jones Aff., ¶ 13. Rabobank urges that since it was not a party to the Trust Agreement, the provisions therein could not require it to apply the Trust funds in this manner. Affidavit of Michel de Konkoly Thege, sworn to on September 26, 1991 ("Thege Aff. 2"), ¶ 6. Rather, the draft Trust Agreement was only binding on an unnamed trustee.

 It is NNIC's position that the Offering Memorandum, the Trust Agreement, the Surety Bond and the other documents should be read together as interdependent documents. NNIC argues that if these documents are considered interdependent, then Rabobank's failure to properly apply

---

**8.** Although the parties have completed their document exchange, neither party has shown that the Trust Agreement was ever executed or that the Offering Memorandum referred to was the final Offering Memorandum related to this transaction. For example, the Court notes that the interest rate of 12½% referred to in the Offering Memorandum was not the 13½% provided for in the actual Investor Notes.

Rabobank urges that NNIC's failure to obtain an executed version of the Trust Agreement indicates that the Trust was never created. Thege Aff. 2, ¶ 6. However, Northwestern provides a

form letter completed by a Rabobank vice-president indicating that $1,320,000 was being held by Rabobank in the Trust. Jones Aff., Exh. 5. Jones Aff., Exh. 7. The Rabobank vice-president, Paul Dekker, states that in completing that form letter he merely intended to acknowledge that Rabobank held a $1,320,000 certificate of deposit for Beefmasters. He states that to his knowledge Rabobank did not know of the existence of an executed Trust Agreement. Affidavit of Paul Dekker, sworn to on September 25, 1991 ("Dekker Aff."), ¶ 6.

the Trust funds constituted "wilful misconduct" or "gross negligence," two grounds written into the Surety Bond upon which NNIC was entitled to refuse payment. Jones Aff., ¶ 44. Therefore, it must be determined whether the several documents can be considered interdependent such that the parties involved in the financing of Beefmasters intended that the proceeds of the $1,320,000 note issued by Rabobank to Beefmasters would first be devoted to payment of principal on the Investor Notes and only thereafter to other partnership obligations. Whether these documents were ever executed and whether they may be considered interdependent, involve issues of fact which warrant further discovery, including discovery from third parties.[9]

As a matter of law, there are factual circumstances in which the several documents at issue may be considered interdependent. In *Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199 (2d Cir.1989),[10] the Second Circuit noted, "Two separate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended. Whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case." *Id.* at 204, *citing Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 769–70 (2d Cir.1975). *Accord Rud-*

*man v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972).

▮ Rabobank argues that because it was not a party to the Offering Memorandum, Grantor Trust Agreement, and Surety Bond, these agreements cannot be considered interdependent with the Loan Agreement, Security Agreement or Pledge Agreement. Although a variation in parties among several documents may argue against considering them as interdependent, it does not, as a matter of law, prohibit them from being so found. *Nat'l Union Fire*, 892 F.2d at 204 citing *Rudman*, 330 N.Y.S.2d at 42, 280 N.E.2d at 873. The fact that all of the documents at issue took effect on the same day, December 21, 1984, supports the argument that the separate documents may be considered interdependent. *Lowell*, 527 F.2d at 769.

Rabobank also claims that because NNIC cannot produce an executed copy of the Grantor Trust Agreement, there is no evidence that there are two separate agreements at all. It points out that because provisions in the Pledge Agreement and the Security Agreement do not square with the terms of the Offering Memorandum and Grantor Trust Agreement, NNIC's argument must fail. These arguments point to the necessity for third party discovery.

**9.** NNIC argues that Rabobank's motion for summary judgement is premature because it has not had adequate opportunity to conduct discovery, and that the motion be denied pursuant to Fed. R.Civ.P. 56(f).

Rule 56(f) *requires* the opponent of a motion for summary judgement who claims to be unable to produce evidence in opposition to the motion to file an affidavit explaining:

(1) the nature of the uncompleted discovery, i.e. what facts are sought and how they are to be obtained;

(2) how those facts are reasonably expected to create a genuine issue of material fact;

(3) what efforts the affiant has made to obtain those facts; and

(4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp*, 769 F.2d 919, 926 (2d Cir.1985) (emphasis added). A party's mere failure to file such an affidavit can be enough to reject a claim that the opportunity for discovery was inadequate. *Id.*

The only affidavit which NNIC has submitted does not begin to meet the specificity required by *Burlington Coat Factory*. Accordingly, while the Court must address the motion for summary judgement on its merits, it notes the appropriateness of additional discovery.

**10.** In *Nat'l Union*, the Court considered a case with facts similar to the one here. There, investors in a limited partnership had issued certain promissory notes backed by the guarantee of an insurance company. The investors had agreed to indemnify the insurance company for any payments it might make. When the investors defaulted on the notes, the insurance company sued to enforce the indemnity agreements. As a defense to enforcement, the investors argued that the indemnity agreements should be considered in tandem with the underlying subscription agreements pursuant to which they obtained their partnership interests. The Court held that the indemnity and subscription agreements should be considered interdependent documents. 892 F.2d at 200, 203.

■ In essence, whether Rabobank properly applied the Beefmasters funds boils down to the intent of the parties to the financing transaction. Questions of intent are usually inappropriate for disposition on summary judgment. *Wechsler v. Steinberg*, 733 F.2d 1054, 1058–1059 (2d Cir. 1984). Accordingly, the motion for summary judgment on Rabobank's first claim is denied.

### 2. *Rabobank's claim for $87,412.50*

Rabobank also moves for summary judgment on its claim for $87,412.50, representing the amount due on the final quarterly interest payments under the Investor Notes.

The interest provision in each of the Investor Notes dated December 21, 1984, states that:

> Maker also promises to pay to order of Payee interest computed from the date hereof on the unpaid principal balance hereof, payable quarterly commencing on the first day of the first calendar quarter after the date hereof and ending on the sixth anniversary of the date hereof or maturity, if earlier, at a rate of 13½ per cent per annum.

Under the plain language of this clause, interest was to be computed beginning on "the date hereof," December 21, 1984, continuing until "the sixth anniversary of the date hereof," December 21, 1990, and payable quarterly beginning on January 1, 1985. Thus, the final payment of interest was calculated as of December 21, 1990, but Rabobank did not consider it payable until January 1, 1991. Rabobank's notice of default letter of January 20, 1991, stated precisely that "an interest payment under each of the [Investor] Notes was due on January 1, 1991." Jones Aff., Exh. 11.

NNIC argues that under the interest provision of the Notes, all payments were to end "on the sixth anniversary of the date hereof," i.e. on December 21, 1990. Because this last interest payment was not stated as due until January 1, 1991, NNIC argues that this final payment does not fall within the coverage of the Surety Bond.

■ The object of contract interpretation is to give effect to the expressed intentions of the parties. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989). Contract language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. *Id.* Despite the efforts of NNIC to obfuscate the meaning of the interest clause in the Investor Notes, the intention behind it is clear. The Investors were to make payments of interest calculated beginning December 21, 1984, but not payable until the first day of the following calendar quarter. The only reasonable interpretation of the clause is that the final payment of interest was computed as of December 21, 1990, but payable on January 1, 1991. NNIC's claim that it was responsible for all interest payments under the Investor Notes except for the final one exceeds the limits of credibility.

Accordingly, Rabobank's motion for summary judgment on its claim for $87,412.50 is granted.

## CONCLUSION

For the reasons stated above, Defendant's motion to stay this action is denied. Plaintiff's motion for summary judgment is granted in part and denied in part. Discovery by deposition of the parties and of third parties shall commence immediately and must be completed by January 15, 1992. A pre-trial order must be submitted by January 24, 1992. All counsel are ordered to attend a trial conference on February 3, 1992 at 9:00 a.m. in Courtroom 302.

IT IS SO ORDERED.