**Gary CLARKE, Susan Clarke and WWBI TV, Inc., Plaintiffs,**

v.

**MAX ADVISORS, LLC, Max Media Properties, LLP, Max Television, Inc., Max Holding, LLC, Max Management, LLP, A. Eugene Loving, John A. Trinder, Defendants/Third–Party Plaintiffs,**

v.

**SMC Communications, Inc. Third–Party Defendant.**

No. CIV.A.1:02–CV–0308 DEP.

United States District Court, N.D. New York.

Dec. 16, 2002.

Law Office of Mark Schneider, Platts-
burgh, NY, Mark Schneider, Esq., for
Plaintiffs and Third–Party Defendant.

Menter, Rudin Law Firm, Syracuse,
NY, Mitchell J. Katz, Esq., Williams, Mul-
len Law Firm, Newport News, VA, Chris-
topher A. Abel, Esq., for Defen-
dants/Third–Party Plaintiffs.

### DECISION AND ORDER

PEEBLES, United States Magistrate
Judge.

The broad array of legal skirmishes
comprising this commercial suit have as
their genesis a failed business transaction
centered around ownership and operation
of a commercial television broadcasting
station located in northern New York, and
owned and operated by the plaintiffs.
Both sides of the unsuccessful sale now
seek the court's intervention, and have re-
quested various forms of relief. For their
part the defendants, who the plaintiffs as-
sert wrongfully aborted the venture, es-
sentially seek the court's imprimatur upon
its refusal to exercise an option for the
purchase of the station, and additionally to
elicit aid in securing repayment of monies
loaned to the plaintiffs in anticipation that
a sale would occur. Plaintiffs, on the other
hand, characterize the transactions be-
tween the parties very differently from
those evidenced by the four corners of the
relevant written documents prepared,
signed and exchanged, and to a large de-
gree have asked this court to reframe the
parties' business relationship to coincide
with their expectations and understandings
of the deal.

Currently pending before the court in
this action—which is in its infancy—are
cross-motions, to some degree procedural
but largely dispositive in nature. Plain-
tiffs have requested leave to amend their
answer to defendants' counterclaims in or-
der to add as defenses claims which have
already been asserted as causes of action
in their complaint. From a dispositive
point of view, defendants seek summary
judgment dismissing plaintiffs' various
claims and, in essence, declaring that the
option agreement entered into was just
that—an option which was never in fact
exercised. Defendants also ask that sum-
mary judgment be entered in their favor
finding liability based upon various notes
given by the plaintiffs. Plaintiffs oppose
those motions and seek summary judg-
ment on their various claims including,
*inter alia*, for fraud and fraud in the in-
ducement.

Given the many and diverse claims and
defenses asserted in the parties' pleadings
as well as the large volume of materials
exchanged in connection with the pending
motions, I am tasked with parsing out
which of the various—and often contradic-

tory—claims interposed by the parties should remain in the action, and to concisely frame the claims and defenses, if any, which should go forward in light of the existence of triable issues of material fact. For the reasons set forth below, I find that plaintiffs' motion for leave to amend should be granted in small part, but largely denied on the basis of futility. In addition, I find that summary judgment is appropriate on various claims, but that there remain genuine issues of material fact principally surrounding plaintiffs' fraud and quasi contract claims, thereby precluding the entry of summary judgment disposing of all claims and defenses in the action.

## I. BACKGROUND

### A. The Parties

Plaintiffs Gary and Susan Clarke are husband and wife, and together reside in Champlain, New York. At all times relevant to the various claims and defenses asserted in this action, the Clarkes have been directly involved in the ownership and operation of WWBI–TV, a commercial television station broadcasting on Channel 27 and operated out of the Plattsburgh, New York area.[1] At the time the parties began their discussions regarding sale of the station, Susan Clarke was the Federal Communications Commission ("FCC") licensee for Channel 27, although that license was subsequently transferred to third-party defendant SMC Communications, Inc. ("SMC"), a Delaware corporation formed in July of 1997 and wholly owned by Susan Clarke. The assets associated with the station are owned by the Clarkes and WWBI TV, Inc., another De-

laware corporation of which 99.5% of the stock is owned by Susan Clarke.

The interrelationship between the several defendants is somewhat more complicated than that involving the various Clarke entities. Defendant Max Media Properties, LLC ("Max Media") is a former Virginia limited liability company with headquarters in Virginia Beach, Virginia. Max Media was sold by its owners on July 3, 1998 to Sinclair Communications, Inc., and was apparently renamed a short time later as Sinclair Properties, LLC. Max Advisors, LLC ("Max Advisors") and Max Management, LLC ("Max Management") are two other Virginia limited liability companies also centered in Virginia Beach, Virginia. Both of these entities have at least some degree of involvement in the contemplated acquisition of WWBI–TV as well as the advances of monies to the Clarkes. Max Holding, LLC—an entity which is named in the caption of plaintiffs' verified complaint but not among the parties described within the body of that pleading (see Complaint (Dkt. No. 1) ¶¶ 3–11)—does not appear to have been involved in any of the dealings between the parties in this action. Similarly, Max Television Company, which is described in plaintiffs' complaint as being located in Virginia Beach, Virginia and a successor in interest to Max Media, does not appear from the record now before the court to have had involvement with the transactions at issue in this case.[2]

The two individual defendants, A. Eugene Loving and John A. Trinder, are alleged by the plaintiffs to operate various businesses out of 900 Laskin Road, Virginia Beach, Virginia, and to be involved in

---

1. WWBI–TV is actually headquartered in Rouses Point, New York.

2. Max Television was originally sued by plaintiffs in the name of Max Television, Inc. De-

fendants have since asserted that no such entity exists, but acknowledge the existence of Max Television Company.

the ownership and operation of various Max entities. In their affidavits, Loving and Trinder admit being members of Max Advisors and Max Management, and former members of Max Media. The record is not clear, however, as to their involvement, if any, with Max Holding and Max Television.

### B. *Negotiation And Execution Of The Option Agreement*

In or shortly prior to April of 1997, Gary and Susan Clarke approached representatives of Max Media, including Loving and Trinder, to determine their level of interest in leasing WWBI–TV. Negotiations concerning this prospect ensued, resulting in the issuance by Max Media representatives on May 7, 1997 of a letter of intent expressing their interest in pursuing the possibility of purchasing the station and describing contemplated terms of the transaction. *See* Plaintiffs' Exhibits (Dkt. No. 57) Exh. 4. That letter provided for negotiation and execution of an option agreement, and for the Max entities to loan monies to the Clarkes.

A written option agreement was subsequently entered into between WWBI–TV, referred to in that agreement as "seller," as well as the Clarkes, and Max Media, "the buyer," on or about July 11, 1997. Defendants' Exhibits (Dkt. No. 61) Exh. 1. Under the terms of that agreement, in return for forgiveness of debt on the part of WWBI–TV and the Clarkes as well as compensation to be paid to Gary Clarke under a separate but related agreement providing for his employment by Max Media, Max was given the right to exercise the option and acquire the assets of the station for an agreed purchase price of two million dollars. That option agreement, which originally expired of its own terms

on December 31, 1998, was extended by agreement of the parties, but ultimately expired without having been formally exercised by Max Media.[3]

### C. *Promissory Notes*

The July 11, 1997 option agreement contained a provision authorizing WWBI TV and the Clarkes to borrow money, characterized as "advances", from Max Media. Defendants' Exhibits (Dkt. No. 61) Exh. 1 Art. 11. The option agreement restricted the Clarkes' use of any advances received, providing that they could be used for taxes or to defray other expenses associated with operation of the television station. *Id.* The mechanism for requesting and receiving advances was specified in the option agreement, and included the requirement that WWBI TV and the Clarkes give promissory notes and a security agreement with requisite UCC financing statements, as well as a stock pledge, to secure repayment on the notes. *Id.* § 11.5.

In accordance with those provisions of the option agreement, the Clarkes sought and received from the Max entities advances in excess of $400,000, in three separate phases. Between approximately July 25, 1997 and August 28, 1997 Max Media advanced $145,500 to WWBI TV and the Clarkes. In return, three separate notes were executed on July 25, 1997 ($50,000), August 28, 1997 ($67,500), and August 28, 1997 ($28,000) (collectively, the "Series I Notes"). *See* Defendants' Exhibits (Dkt. No. 61) Exhs. 3–5. The Series I Notes were signed by Susan Clarke, as President of WWBI TV, Inc., as well as by Gary Clarke and Susan Clarke individually. *Id.*

Additional advances in the aggregate amount of $231,676 were given by Max Media to WWBI and the Clarkes between

---

**3.** The option agreement was assigned by Max Media to Max Management on July 3, 1998 as a consequence of the Max Media sale to Sinclair.

August 29, 1997 and April 20, 1998. In return, notes were executed and given to Max Media on August 29, 1997 ($37,000), August 29, 1997 ($25,000), October 7, 1997 ($30,000), October 7, 1997 ($79,000), October 24, 1997 ($42,500) and April 20, 1998 ($18,176) (collectively, the "Series II Notes"). *See* Defendants' Exhibits (Dkt. No. 61) Exhs. 6–11. The Series II Notes were signed by Susan Clarke on behalf of both WWBI TV and SMC, as well as by Gary and Susan Clarke individually. *Id.*

A third advance, in the amount of $25,000, was given by Max Management on or about August 17, 1998 pursuant to the option agreement. In return, a promissory note was given on that date (the "Series III Note"). *See* Defendants' Exhibits (Dkt. No. 61) Exh. 12. Like the Series II Notes, the Series III Note was signed by Susan Clarke on behalf of WWBI TV and SMC, as well as by the Clarkes as individuals. *Id.* Unlike the earlier notes, which listed Max Media as the holder, however, Max Management is the named obligee on the Series III Note. *Id.*

According to the defendants, on or about July 3, 1998 Max Media assigned the Series I and Series II Notes to Max Management, the holder of the Series III Note. On December 30, 2000 Max Management, in turn, assigned its rights under all of the notes to Max Advisors, the current holder of all of the relevant notes.[4] As holder of the notes, Max Advisors made written demand for payment to the plaintiffs and SMC on February 13, 2002. To date, however, no payments have been made under any of the Series I, II or III Notes.

### D. *Plaintiff's Allegations Of Fraud*

Plaintiffs' fraud claims center around defendants' alleged representations to the Clarkes, literally from the onset of negotiations between the parties, that they intended ultimately to purchase WWBI TV, and that the documents being executed were mere formalities calculated toward that end. While defendants vehemently deny ever offering unequivocally to purchase the station, to a large degree they do not contest plaintiffs' recitations concerning conduct of the defendants, primarily on the part of Loving and Trinder, allegedly in furtherance of their efforts to defraud the plaintiffs into believing that they would be purchasing the station and to act in reliance upon that assertion, though they do discount the relevance of those facts.

Plaintiffs allege that shortly after the commencement of negotiations Loving and Trinder, together with two other employees of the Max entities, flew to New York and agreed to buy the station for two million dollars. Gary Clarke Aff. (Dkt. No. 39) ¶ 3. Following that meeting the Max entities are alleged to have acted in a manner wholly consistent with an agreed purchase. The Clarkes claim that they were "wined and dined" and introduced to other Max employees at a station managers' meeting in Tennessee as "the new acquisition". *Id.* ¶¶ 29–31. As part of the arrangement Gary Clarke was engaged by Max, pursuant to an employment agreement, to continue working at the station. *Id.* ¶ 28; *see also* Plaintiff's Exhibits (Dkt. No. 57) Exh. 5. In addition, plaintiffs were introduced to Stephen Burke, Esq., an attorney for the Max companies, and were told that Burke would prepare an option agreement as a "formality" to protect the parties in the event that the sale did not close by the end of 1997, and would also

---

**4.** In response to the defendants' allegations concerning the assignment plaintiffs assert that without the benefit of pretrial discovery they are unable to either admit or deny those allegations, and thus assert Rule 56(f) of the Federal Rules of Civil Procedure as a ground for denial of Max Advisors' motion for summary judgment in its favor on the notes.

assist them in other legal matters related to WWBI TV. Gary Clarke Aff. (Dkt. No. 39) ¶¶ 12–13, 17–24, 34–35.

During the post-option phase, Max employees became more actively involved in the operation of WWBI TV and continued to assure the plaintiffs of their intention to purchase the station. The plaintiffs were encouraged by Max representatives to make improvements at the station. During this period, by way of example, Loving as well as two other Max employees—Charlie Stanton, chief engineer, and Chuck McFadden, a partner—became actively involved in consideration of and negotiation for the rental of antenna tower space at Jay Peak, a Vermont ski resort. *Id.* ¶ 40. Loving also began a search with Gary Clarke for new office space for WWBI in Burlington, Vermont, and together with Charlie Stanton encouraged the plaintiffs to acquire an expensive new transmitter for the station. *Id.* ¶¶ 43–44. Under the parties' arrangement, Gary Clarke continued to be an employee of Max Media through August of 2000, and for a time was allowed to actively participate in monthly telephone conferences involving Max Media station managers. *Id.* ¶¶ 46–52.

Plaintiffs acknowledge receiving money from time to time from the Max entities, and signing notes when receiving those funds. They maintain, however, that the advances were given upon the assurance that the defendants fully intended to purchase WWBI TV, and that Max did not expect repayment of the loans until the sale closing. In reliance upon the continued representations of the defendants concerning their intentions, according to the plaintiffs, they did not seek out other avenues to address their financial woes, and lost the opportunity to market and sell the station to other buyers during the option period.

## II. *PROCEDURAL HISTORY*

In what the defendants have characterized as a preemptive strike, plaintiffs Gary Clarke, Susan Clarke, and WWBI TV, Inc. commenced this action on March 4, 2002. Dkt. No. 1. Named as defendants in plaintiffs' complaint are Max Advisors, LLC; Max Media Properties, LLP; Max Television Inc.; Max Holding, LLC; Max Management, LLP; A. Eugene Loving; and John A. Trinder. *Id.* In their complaint plaintiffs have asserted claims for fraud in the inducement, fraud, *prima facie* tort, breach of contract, quasi contract, *quantum meruit*, unjust enrichment, and bad faith, and seek a variety of legal and equitable remedies which will be described more fully below.

In response to plaintiffs' complaint, defendants served an answer which was filed by the court on April 16, 2002. Dkt. No. 5. That answer included counterclaims against the plaintiffs, and was accompanied by a third-party complaint against SMC asserting claims similar in nature to the counterclaims. *Id.* In their counterclaim and third-party claim against SMC, defendants seek to enforce the three series of promissory notes allegedly reflecting the loan by defendants of monies to SMC and the Clarkes totaling slightly in excess of $400,000. *Id.* Answers on behalf of the plaintiffs (Dkt. No. 6) and SMC (Dkt. No. 13) have since been filed to defendants' counterclaims and third-party complaint.

During a routine Rule 16 pretrial conference conducted by me on June 11, 2002 the parties reported their respective intentions to file dispositive motions. *See* Dkt. No. 16. In light of this disclosure I deemed it advisable, with consent of the parties, to order that with the exception of mandatory disclosure, all discovery in the action should be stayed pending submission and

disposition of the contemplated dispositive motions. *Id.*

The motion process was initiated by the defendants' filing of a motion for summary judgment dismissing plaintiffs' complaint (Dkt.Nos.29–35), a second motion for summary judgment on defendants' note claims against SMC (Dkt.Nos.41–45), and a third summary judgment motion lodged in connection with defendants' note counterclaims against the plaintiffs (Dkt.Nos.48–52). Plaintiffs have since responded with papers in opposition to defendants' three motions (Dkt.Nos.36–39, 46, 53) and the filing of a combined motion for leave to amend and for summary judgment on the claims set forth in their complaint.[5] *See* Dkt. Nos. 55–57, 62–63. The parties' motions, which are now before me on consent of the parties pursuant to 28 U.S.C. § 636(c) (*see* Dkt. No. 19), were the subject of oral argument held on November 1, 2002, and are now ripe for determination.

## III. *DISCUSSION*

Ordinarily, with the pendency of both procedural and dispositive motions I would first address those which are procedural in nature. In light of the complexity of this action and the significant interplay between the legal claims and defenses already in this action and the defenses sought to be raised in plaintiffs' proposed amended pleading, however, I will defer consideration of that issue until the various substantive claims and defenses have been discussed and analyzed.

### A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002). The moving party has the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the nonmoving party's claim. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 n. 4; *Lucente,* 310 F.3d at 253. Once that burden is met, the opposing party must show, through affidavits or otherwise, that there is a material factual issue for trial.[6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Lucente,* 310 F.3d at 253–54; *Wright v.*

**5.** Defendants have filed responses to plaintiffs' motion to amend and for summary judgment. Dkt. Nos. 58–61. Reply memoranda from the defendants addressing their three motions have also been filed with the court. Dkt. Nos. 40, 47, 54.

**6.** A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Lucente,* 310 F.3d at 254. Given this principle, a non-moving party cannot survive a motion for summary judgment merely by relying on the allegations contained in its pleadings, and must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Corselli v. Coughlin,* 842 F.2d 23, 25 (2d Cir.1988). Evidence which is not significantly probative is insufficient to withstand a summary judgment motion. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

*Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998).

### B. *Claims Arising From the Parties' Option Agreement*

Chief among the claims asserted in plaintiffs' complaint are those surrounding the July 11, 1997 written option agreement. In their complaint the plaintiffs ask the court to give effect to extrinsic evidence and, overlooking what defendants claim to be the clear and unambiguous import of the parties' agreement, to transform it into a sales agreement and to enforce the contract, as reframed, by requiring the defendants to purchase the station. Defendants now seek summary judgment dismissing plaintiffs' contract claims arising from the option agreement, and plaintiffs have cross-moved asking that the court award summary judgment in their favor in connection with the agreement. The parties' cross-motions addressed to the option call upon me to engage in contract interpretation in the first instance.

The task of interpreting and enforcing the language of a clear and unambiguous contract is one ideally suited for summary judgment, since interpretation of an unambiguous contract ordinarily implicates a question of law for the court. *See Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568, 573 (2d Cir.1993); *Heyman v. Commerce & Ind. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). The agreement now at issue is entitled "Option Agreement", and its language is entirely consistent with the common understanding of the workings of an option to purchase. An option agreement is typically regarding as "[a] contract made to keep an offer open for a specified period, so that the offeror cannot revoke the offer during that period", and additionally as "[t]he right (but *not the obligation*) to buy or sell a given quantity of securi-

ties, commodities, or other assets at a fixed price within a specified time." Black's Law Dictionary 1121 (7th ed.1999) (emphasis added); *Kaplan v. Lippman,* 75 N.Y.2d 320, 324–25, 552 N.E.2d 151, 153, 552 N.Y.S.2d 903, 905 (1990).

The July 11, 1997 contract falls comfortably within this definition of an option agreement, and its language is uniformly consistent with the traditional option arrangement. Thus, for example, under the agreement WWBI TV and the Clarkes "grant to [Max Media] an Option to acquire all of Seller's and the Clarkes' rights in, to and under the Assets." Defendants' Exhibits (Dkt. No. 61) Exh. 1 § 1.1. The agreement goes on to specify the manner in which the option can be exercised as well as the option exercise deadline date of December 31, 1998, with a right to Max Media to extend the option until June 30, 1999. *Id.* § 1.7. These provisions are clear and unambiguous, and entirely consistent with interpretation of the agreement as an option.

Notwithstanding this clear language unmistakenly characteristic of a traditional option agreement, plaintiffs ask the court to ascribe far different intentions to the parties and to interpret the option as a purchase and sale agreement. The essence of defendants' breach of contract cause of action is concisely captured by one of the allegations set forth in plaintiffs' complaint, in which they allege that "[t]he Defendants have breached the contract by failing to purchase WWBI TV for Two Million Dollars." Complaint (Dkt. No. 1) ¶ 104. The complaint goes on to request that the court order specific performance under the contract by requiring defendants to purchase the station. Complaint (Dkt. No. 1) ¶ 105.

Critical to the plaintiffs' argument, in which they invite the court to consider extrinsic evidence, is a finding of ambigui-

ty, since it is well established that under New York's parol evidence rule extrinsic evidence may not be considered absent such a finding of ambiguity.[7],[8] *Investors Ins. Co. of America v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir.1990).

The question of whether the contract language is ambiguous is one of law, to be resolved by reference to the verbiage at issue. *I.V. Servs. of America, Inc. v. Trustees of the Am. Consulting Eng'rs Council Ins. Trust Fund*, 136 F.3d 114, 119 (2d Cir.1998) (citing *O'Neil v. Retirement Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 58–59 (2d Cir.1994)). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *O'Neil*, 37 F.3d at 59 (internal quotation marks and citation omitted); *see also I.V. Servs. of America*, 136 F.3d at 119 (citing *O'Neil*). In determining the issue of ambiguity *vel non*, as the First Circuit has cautioned, the court should not strain to find ambiguity, and must "abjure unnecessary mental gymnastics which give the terms of the policy a forced or distorted construction." *Taylor v. Aetna Casualty and Surety Co.*, 867 F.2d 705, 706 (1st Cir.1989) (citation and internal quotation marks omitted).

The language of the option agreement is clear and unequivocal. The agreement affords Max Media the right, at its discretion, to purchase the station by exercising the option within the prescribed time period, which in this case was enlarged by agreement of the parties. The exercise of the option required an affirmative act which, plaintiffs acknowledge, did not occur. Plaintiffs are therefore not entitled to a judgment finding liability of one or more of the defendants for breach of contract, based upon the written option agreement, and directing Max Media to purchase the assets of the station.

The fact that plaintiffs cannot establish that Max Media contractually bound itself to purchase the station does not necessarily end the inquiry, insofar as the breach of contract claim is concerned.[9] While as currently pleaded it is clear that the breach of contract claim hinges upon plaintiffs' assertion that by not buying the station Max Media breached the agreement, the written and oral arguments advanced in opposition to defendants' summary judgment motion and in support of the plaintiffs' cross-motion suggest the exis-

---

7. The option agreement, by its express terms, provides for its interpretation in accordance with New York law. Defendants' Exhibits (Dkt. No. 61) Exh. 1 § 12.5. Neither side argues that New York law should not govern interpretation and enforcement of the option agreement.

8. The July 11, 1987 option agreement contains an integration clause which provides that

> [t]his Agreement and the Schedules hereto and thereto and the other documents delivered hereunder constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof, and supercede all prior agreements, understandings, inducements

or conditions, expressed or implied, oral or written, relating to the subject matter hereof, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of trade inconsistent with any of the terms hereof.

Defendants' Exhibits (Dkt. No. 61) Exh. 1 § 12.6.

9. While plaintiffs' complaint does not discriminate among the various named defendants, clearly there is no basis for finding breach of contract liability against any of them with the exception of Max Media, the original signatory, and Max Management, to which the option agreement was assigned.

tence of other potential breaches. *Compare* Complaint (Dkt. No. 1) ¶¶ 98–106 *with* Plaintiffs' Memorandum (Dkt. No. 55) at 38–40. Plaintiffs now assert two independent breaches of the option agreement, the first based upon the assignment of the agreement on July 3, 1998 from Max Media to Max Management, in violation of a provision requiring the written consent of WWBI TV, Inc. (*see* Defendants' Exhibits (Dkt. No. 61) Exh. 1 § 12.1) and the second centering around the sale of Max Media to Sinclair Communications—an entity already owning a Plattsburgh television station—allegedly violating another provision of the contract (*see id.* § 5.8). *See* Plaintiffs' Memorandum (Dkt. No. 55) at 38–39. Plaintiffs now argue that these acts on the part of the defendants constituted breaches of the parties' contract, giving rise to a finding of liability and precluding the entry of summary judgment dismissing their contract claims.

Under New York law, the elements of a cause of action for breach of contract include 1) formation of a contract between the plaintiff and defendant, 2) performance by the plaintiff, 3) failure by the defendant to perform, and 4) resulting damages. *Furia v. Furia*, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12, 13 (2d Dept.1986). Based upon the record now before me, at a minimum there appears to be a question as to whether the actions on the part of Max Media in assigning the option agreement, and by the Max entities in selling the assets of Max Media to Sinclair, represent a breach of the option agreement. Unfor-

tunately for the plaintiffs, however, the record in this case is devoid of any evidence of damages to the plaintiffs as a result of either of these alleged breaches.[10] As was previously noted, the establishment of damages suffered is an essential element of a breach of contract cause of action. *Hudson v. Loretex Corp.*, No. 95–CV–844(RSP/RWS), 1997 WL 159282, at *5 (N.D.N.Y. Apr.2, 1997) (Pooler, J.) (citing *Lexington 360 Assocs. v. First Union Nat'l Bank of North Carolina*, 234 A.D.2d 187, 189–90, 651 N.Y.S.2d 490, 492 (1st Dept.1996)). Questions regarding those potential breaches therefore do not stand in the way of the entry of summary judgment dismissing plaintiffs' contract claims.

In sum, I find that plaintiffs are not entitled to summary judgment in their favor on the breach of contract claims stemming from the option agreement. Conversely, I find no genuine issue of material fact precluding the entry of summary judgment dismissing plaintiffs' contract claims based upon the July 11, 1997 option, including those bottomed upon an alleged agreement by the defendants to purchase WWBI TV, Inc.

### C. *Claims Relating to The Notes*

In the pending motions defendant Max Advisors, as holder of the Series I, II and III Notes, seeks summary judgment on its claims against Gary Clarke, Susan Clarke and WWBI TV, Inc., as the obligors under those notes, and additionally requests summary judgment against defendant SMC as an additional signatory to the Series II

---

10. The essence of plaintiffs' claim concerning the sale to Sinclair is that the net result was acquisition of another station within the Plattsburgh, New York market precluding defendants from exercising the option, in violation of an option restriction against such an action. *See* Defendants' Exhibits (Dkt. No. 61) Exh. 1 § 5.8. Leaving aside questions about whether simultaneous sale to Sinclair, which apparently served another station in the region, and whether assignment of the option to Max Management yielded such a breach resulting in "impossibility" of performance of the option according to the plaintiffs, there were no damages to the plaintiffs, since by its terms the defendants were free to let the option expire without exercising it.

and III Notes. In opposition to these requests, plaintiffs and SMC assert that the notes 1) were the product of fraud in the inducement, 2) are unconscionable, and 3) were improperly assigned, in violation of a non-assignment clause contained in the separate but related option agreement intended by the parties to cover the notes as well.

It is important to note at the outset that in resisting summary judgment the plaintiffs and SMC do not quarrel with the authenticity of the notes, nor do they challenge that the notes were signed, that plaintiffs and SMC received the monies referenced in the notes, that the notes are now due and owing, and that plaintiffs and SMC have not made payments under the notes despite demand from the holder. Instead, plaintiffs argue that the notes were void *ab initio*, since they were the product of fraud in the inducement.[11] *See* Answer to Counterclaims (Dkt. No. 6) ¶¶ 37–43.

### 1. *Fraud*

■ It is well established that fraud in the inducement may provide a defense to a breach of contract claim. *E.g., GTE Automatic Electric Inc. v. Martin's Inc.*, 127 A.D.2d 545, 545–46, 512 N.Y.S.2d 107, 107–08 (1st Dept.1987). To establish fraud, including fraud in the inducement, a plaintiff must demonstrate each of the following elements: 1) the defendant made a representation; 2) as to a material fact; 3) which was false; 4) and known to be false by the defendant; 5) for the purpose of inducing the other party to rely on it; 6) the other party rightfully relied on it; 7) in ignorance of its falsity; and 8) to his or her injury. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373, 646 N.Y.S.2d 76, 80 (1996); *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d 186, 193 (2d Dept. 1980); *Perez v. Hempstead Motor Sales, Ltd.*, 173 Misc.2d 710, 717, 662 N.Y.S.2d 184, 188 (1997).

The gravamen of plaintiff's fraudulent inducement claim is that the loans, while characterized as such in the notes, were stated to be "advances" in the option agreement and that this, coupled with assurances that defendants were purchasing the station and that the loans did not need to be repaid, constituted a misrepresentation giving rise to fraud in the inducement.

■ As defendants correctly observe, ordinarily there can be no finding of fraud if the matter in question was readily verifiable by the plaintiffs through ordinary means—that is, if the representation at issue was not concerning knowledge peculiar to the defendants. *Stuart Silver Assocs., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 98–99, 665 N.Y.S.2d 415, 417 (1st Dept. 1997); *Callahan v. Miller*, 194 A.D.2d 904, 905–06, 599 N.Y.S.2d 145, 146 (3d Dept. 1993). In this case the plain language of the notes suggests the parties' understanding that repayment of the loans evidenced in those notes would be required in the event the option was not exercised, since each of those notes makes at least implicit reference to the possibility that the option will expire without exercise, restricting the holder from making demand for payment until certain events have occurred including, *inter alia*, option expiration. *See* Defendants' Exhibits (Dkt. No. 61) Exhs. 3–12 § 4. Accordingly, defendants argue,

---

11. Plaintiffs' fraud in the inducement claim is actually pleaded as an affirmative claim. *See* Complaint (Dkt. No. 1) ¶¶ 71–83. It is clear, however, that by pleading this claim, plaintiffs in essence seek a declaratory judgment that the promissory notes, which, according to plaintiffs, were the direct result of fraud in the inducement, should be declared null and void. *Id.*

there was no fraud in the inducement since the statement alleged in the complaint as constituting a misrepresentation is inconsistent with the plain language of both the option agreement and the notes.

■ It is also true, as defendants argue, that fraudulent inducement requires a misrepresentation of a present fact, and not of a future intent, absent a showing that the defendant has a preconceived and undisclosed intention of not performing as represented. *Sabo v. Delman,* 3 N.Y.2d 155, 160, 143 N.E.2d 906, 908, 164 N.Y.S.2d 714, 716 (1957). Thus, without more there can be no fraud when the only claim is based upon a party's failure to perform a future act. *Rubenstein v. East River Tenants Corp.,* 139 A.D.2d 451, 454, 527 N.Y.S.2d 29, 32 (1st Dept.1988).

In this case the record is lacking in evidence to suggest that at the time of entering into the option agreement and notes, Max Media had no intention of purchasing WWBI, as contemplated during the parties' discussions. Indeed, plaintiffs do not even suggest a possible motive for Max Media entering into those agreements with no expectation of performance, nor do they hypothesize as to what benefit could inure to Max Media as a result of the alleged fraud scheme.

■ Notwithstanding these glaring shortcomings in the record, it is nonetheless well established that questions concerning a party's intent ordinarily present issues of fact. *See, e.g., Kahuna Group, Inc. v. Scarano Boat Building, Inc.,* 984 F.Supp. 109, 114–15 (N.D.N.Y.1997) (McA-

voy, C.J.); *Goshen Litho, Inc. v. Kohls,* 582 F.Supp. 1561, 1564 (S.D.N.Y.1983). Because of the inherent unfairness in granting summary judgment on the issue of intent based upon a failure of proof without first allowing the plaintiffs to engage in discovery to ascertain defendants' expectations when entering into the option agreement and making advances—questions which in this case are uniquely within the defendants' knowledge—I decline the invitation to grant summary judgment on the question of fraud in the inducement.[12] *Cf.* Fed. R. Civ. R. 56(f).

### 2. *Accord, Satisfaction and Release*

In their third affirmative defense plaintiffs assert accord, satisfaction and release as a further basis for rejecting defendants' note claims. Answer to Counterclaims (Dkt. No. 6) ¶¶ 44–47. Although the allegations supporting this defense are somewhat sketchy, plaintiffs appear to be arguing that under the terms of the option agreement they were exonerated from the obligation to repay monies loaned or advanced to them. *See, e.g., id.* ¶ 47. Plaintiffs actually combine two distinct legal theories in this defense—those of accord and satisfaction, and of release.

■ As its name implies, an accord and satisfaction has two components. An accord is an agreement that an agreed-upon performance will be accepted, in the future, in lieu of an existing claim. *Denburg v. Parker Chapin Flattau & Klimpl,* 82 N.Y.2d 375, 383, 624 N.E.2d 995, 1000, 604 N.Y.S.2d 900, 905 (1993). Execution of that agreement constitutes satisfaction.

12. In support of their motion for summary judgment on the notes defendants also rely on the standard merger clause language, arguing that plaintiffs cannot assert fraud in the inducement in light of the parol evidence rule, maintaining that for this reason the affidavits submitted by Gary and Susan Clarke should be disregarded as rife with admissible parol evidence. It is well established, however, that a merger clause is insufficient to preclude reliance upon parol evidence on the question of fraud in the inducement, absent language in the merger clause directly addressing the specific representations at issue. *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315–17 (2d Cir.1993).

*Id.* at 383, 624 N.E.2d at 1000, 604 N.Y.S.2d at 905.

■ To have a valid accord and satisfaction, the parties must enter into a new and binding contract with reasonably certain material terms. *Altamuro v. Capoccetta,* 212 A.D.2d 904, 904–05, 622 N.Y.S.2d 155, 157 (3d Dept.1995). If there are conflicting versions of what constitutes the agreement, no accord and satisfaction exists. *Id.* at 905, 622 N.Y.S.2d at 157. The burden of showing accord and satisfaction is on the party asserting it. *See Environmental Prods. & Servs. Inc. v. Consolidated Rail Corp.,* 285 A.D.2d 700, 702, 728 N.Y.S.2d 256, 258 (3d Dept.2001).

■ A release, on the other hand, involves the present intent to abandon a right or claim to the party against whom the claim exists or against whom the right is to be exercised or enforced. *McMahan & Co. v. Bass,* 250 A.D.2d 460, 461, 673 N.Y.S.2d 19, 21 (1st Dept.1998); *State v. Upstate Storage, Inc.,* 145 A.D.2d 714, 714, 535 N.Y.S.2d 246, 248 (3d Dept.1988). Where the provisions of a release are part of a written agreement which also contains other provisions relating to the rights and duties of the parties, the release provisions should be construed in the context of the entire agreement as a whole, including any separate but related documents. *See Schenectady Discount Corp. v. Myers,* 5 A.D.2d 728, 729, 168 N.Y.S.2d 727, 729 (3d Dept.1957). Release is an affirmative defense which must be proven by the party asserting it. *DiIorio v. Gibson & Cushman of New York, Inc.,* 161 A.D.2d 532, 533, 166 A.D.2d 334, 566 N.Y.S.2d 1, 2 (1st Dept.1990).

■ While plaintiffs have asserted the defenses of accord and satisfaction and release, they have failed to produce any evidence which would suggest that as holder of the notes in question Max Advisors or its privies has engaged in conduct which would give rise to such a defense. While it is true that the loans evidenced by the notes in question are referenced in the option and characterized therein as advances, there is nothing in either the notes or the option to indicate that in the event of a decision by the Max entities not to exercise the option, payment under the notes would be excused. I therefore reject the defenses of accord and satisfaction and release as a matter of law as a basis for denying summary judgment on defendants' note claims.

3. *Unconscionability*

■ Plaintiffs have also asserted unconscionability in response to defendants' motion for summary judgment on their note claims.[13] Under New York law unconscionability is a defense to the enforcement of a contract. *See Barco Auto Leasing Corp. v. PSI Cosmetics, Inc.,* 125 Misc.2d 68, 76, 478 N.Y.S.2d 505, 512 (N.Y.City Civ.Ct. 1984); *Rzepko v. Gia Gem Trade Lab., Inc.,* 115 Misc.2d 755, 758–59, 454 N.Y.S.2d 495, 497–98 (N.Y.Sup.1982) (citing CPLR 3018(6)). To establish unconscionability a party must make "some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Siemens Credit Corp. v. American Transit Ins. Co.,* No. 00 CIV. 0880 (BSJ), 2001 WL 40775, at *1 (S.D.N.Y. Jan.17, 2001) (citations and internal quota-

---

**13.** The defense of unconscionability is not pleaded in either plaintiffs' answer to defendants' counterclaims or in SMC's answer to the third-party note claims. Unconscionability is, however, asserted as the ninth affirmative defense in plaintiffs' proposed amended answer to counterclaims and by SMC to the third-party claims—the pleading which plaintiffs now seek permission to file. *See* Plaintiff's Exhibits (Dkt. No. 57) Exh. 17 ¶¶ 84–87.

tion marks omitted). As can be seen, the defense of unconscionability consists of two elements, one procedural and the other substantive in nature.

In this instance plaintiffs have demonstrated, at a minimum, the existence of triable issues of fact concerning the procedural component. Neither the Clarkes nor any other representative of WWBI TV, Inc. or SMC was represented by counsel during negotiations concerning the option and notes. According to the Clarkes, Max Media threatened to walk away from the contemplated purchase of the station if they did not sign the agreement. Additionally, the plaintiffs have provided evidence that by signing the agreement they would be exempted from the repayment of the initial $25,000 in advances. At a minimum, these facts demonstrate the existence of triable issues concerning the procedural element of an unconscionability defense.

The difficulty with the unconscionability defense now advanced by the plaintiffs and SMC comes with the substantive element. Examination of the option and notes reveal that they are standard, commercially reasonable agreements and do not contain any of the earmarks normally associated with unconscionability. While plaintiffs have argued in support of their unconscionability defense that no reasonable person would have entered into the agreement struck by the parties, there are no specifics alleged as to how any of the provisions contained within the relevant agreements were not commercially reasonable. *See* Plaintiffs' Memorandum (Dkt. No. 55) at 24–27.

In light of the lack of any evidence suggesting that a reasonable jury could make a finding of substantive unconscionability, I reject the unconscionability defense now proffered by the plaintiffs and SMC as a basis for denial of defendants'

motion for summary judgment on the note claims.

### 4. *Nonassignability*

■ In defense of the note claims against them, plaintiffs and SMC also argue that those instruments were intended by the parties to be non-assignable, but were nonetheless transferred by the original obligees to Max Advisors, the current holder. In making this argument plaintiffs acknowledge that the notes themselves do not contain any provisions restricting assignment. To the contrary, each of the notes includes the phrase "or assigns" when identifying the holder. Nonetheless, plaintiffs contend that the notes were subject to the separate but unrelated non-assignment clause included within the option agreement. Under that provision, Max Media was permitted

> with the consent of Seller, [to] assign its rights and obligations [under the option agreement] to (i) any entity under common control with Buyer or (ii) any entity in connection with a transfer of one or more of the other television or radio stations owned or operated by Buyer to such assignee (a "Permitted Assignee").

Defendants' Exhibits (Dkt. No. 61) Exh. 1 § 12.1. The clause goes on to provide that "[o]ther than to a Permitted Assignee, Buyer may not assign any of its rights or delegate any of its duties hereunder without the prior written consent of Seller." *Id.*

The plaintiffs assert that this provision was intended to include the notes referenced earlier in the option agreement. "Whether the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact." *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 13, 280 N.E.2d 867, 873, 330 N.Y.S.2d 33, 42 (1972); *see*

*also National Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 204–05 (2d Cir.1989) (applying *Rudman* interdependent contract theory to contracts alleged to be induced by fraud); *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 769–70 (2d Cir.1975); *Cooperative Centrale Raiffeisen–Boerenleen Bank B.A. v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin* ("*Raiffeisen–Boerenleen Bank*"), 778 F.Supp. 1274, 1280 (S.D.N.Y. 1991) (noting that whether loan documents could be considered interdependent involved issues of fact warranting further discovery). The key inquiry is "the intent manifested, viewed in the surrounding circumstances", a question normally inappropriate for resolution on motion for summary judgment. *Rudman*, 30 N.Y.2d at 13, 280 N.E.2d at 873, 330 N.Y.S.2d at 42; *see also Turtur*, 892 F.2d at 205 (citation omitted); *Lowell*, 527 F.2d at 770; *Raiffeisen–Boerenleen Bank*, 778 F.Supp. at 1281(citation omitted); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Robert Christopher Assocs.*, 257 A.D.2d 1, 6, 691 N.Y.S.2d 35, 39 (1st Dept.1999). By way of example, although form is not determinative, the fact that two parties entered into separate agreements with ·"separate assents" is a significant factor to be considered. *Rudman*, 30 N.Y.2d at 13, 280 N.E.2d at 873, 330 N.Y.S.2d at 42 (citations omitted); *see also Robert Christopher Assocs.*, 257 A.D.2d at 6, 691 N.Y.S.2d at 39. Although a variation in parties among documents argues against interdependency, it does not necessarily preclude such a finding as a matter of law.[14] *Turtur*, 892 F.2d at 205; *Raiffeisen–Boerenleen Bank*, 778 F.Supp. at 1280; *cf. Rudman*, 30 N.Y.2d at 13, 280 N.E.2d at 873–74, 330 N.Y.S.2d at 42 ("Recognizing that the agreements involved formally different

parties, and actually executed on different dates … the conclusion of separateness becomes all but inescapable."). On the other hand, documents signed on the same day can lend support to a finding of interdependency. *Raiffeisen–Boerenleen Bank*, 778 F.Supp. at 1280; *see also, e.g., Turtur*, 892 F.2d at 205.

Although the argument that the option agreement's non-assignment clause restricted Max Media from assigning notes given at the time of advances and plaintiffs' "assumption" that the notes were not assignable in light of this provision (*see* Plaintiffs' Memorandum (Dkt. No. 55) at 27), and the effect if any the assignment and derogation of this clause had on the obligations evidenced by the notes, is weak, it cannot at this juncture be said that there are no issues of fact to be decided and that the note holder is entitled judgment as a matter of law on the note claims. A question exists as to whether the parties intended the assignability provision of the option to extend to the notes. Additionally, ambiguity exists in the language of section 12.1, since it appears that assignment to both a permitted assignee and to someone other than a permitted assignee requires consent of the seller, thereby obligating the court to look beyond the language of section 12.1 to the intention of the parties. And, since plaintiffs have not had the benefit of pretrial discovery at this juncture, they are unable to probe whether Max Advisors is a permitted assignee and what effect, if any, the assignment without their consent—and defendants do not contend that plaintiffs consented to the assignment—had on the notes. Accordingly, I find the existence of genuine triable issues, thereby precluding

---

14. A subfactor of this inquiry is whether the contracts involved were made by different parties with different purposes. *See, e.g., National Union Fire Ins. Co. of Pittsburgh, Pa. v. Clairmont*, 231 A.D.2d 239, 242, 662 N.Y.S.2d 110 (1st Dept.1997).

the entry of summary judgment on the note claims.

In sum, while defendant Max Advisors has established its entitlement to summary judgment on the notes, assuming their validity and assignability, there are triable issues of fact concerning fraud in the inducement—a defense which would undermine the validity *ab initio* of the notes—and as to whether they were properly assigned by the original obligees without plaintiffs' consent, thereby precluding the entry of summary judgment on the note claims at this juncture.

### D. *Plaintiffs' Fraud Claim*

In their second cause of action plaintiffs claim fraud on the part of the defendants, and seek recovery of damages associated with that claim. Complaint (Dkt. No. 1) ¶¶ 84–92. In support of that claim, plaintiffs allege that the defendants intentionally misled them by declaring their intention to purchase WWBI TV, and acting in conformity with that stated intention, when in fact they never intended to actually buy the station. *Id.* Plaintiffs maintain that they relied upon those representations to their detriment.

The essential elements of a claim of fraud under New York common law were addressed earlier in this opinion.[15] *Id.* As was noted with regard to plaintiffs' defense of fraud in the inducement, the lynchpin of their fraud claims is their con-

tention that at the time of the allegedly false representations regarding their intention to purchase WWBI, defendants fully expected not to exercise the negotiated option. In light of the fact that this question revolves around the intent of the defendants, and plaintiffs have had no opportunity to explore this question through pretrial discovery, I find that summary judgment at this juncture is inappropriate. Accordingly, I deny defendants' motion for summary judgment dismissing plaintiffs' second cause of action, asserting fraud.[16]

### E. *Prima Facie Tort*

In plaintiffs' third claim for relief, they have asserted a cause of action sounding in *prima facie* tort. Complaint (Dkt. No. 1) ¶¶ 93–97. Defendants seek dismissal of this claim as a matter of law.

The elements essential to establishment of a *prima facie* tort claim under New York law include a showing of 1) intentional infliction of harm; 2) which results in special damages; 3) without excuse or justification; 4) by an act or series of acts which would otherwise be lawful. *Levy v. Coates*, 286 A.D.2d 424, 424, 729 N.Y.S.2d 903, 903 (2d Dept.2001). New York courts have made it abundantly clear that *prima facie* tort does not serve as a "catch all" alternative for a tort claim which would otherwise be insufficient under traditional theories. *Belsky v. Lowen-*

---

**15.** *See* pp. 142–43, *ante.*

**16.** Defendants also argue that the fraud claim is not pleaded with the requisite specificity, citing Rule 9 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 9. It is true that that rule requires allegations of fraud to specifically include express reference to 1) a misrepresentation of a material fact; 2) falsity; 3) knowledge; 4) reliance; and 5) damages. *Hodge By Skiff v. Hodge*, 78 F.Supp.2d 29, 34 (N.D.N.Y.1999) (McAvoy, D.J.). While perhaps in a technical sense plaintiffs' complaint

does not fully comply with the literal letter of Rule 9, it is nonetheless sufficiently specific concerning the misrepresentations made and their reliance on them to apprise the defendants of the nature of the claim. In my view, this shortcoming does not provide a basis for an award of summary judgment. Instead, defendants' recourse is to engage in discovery to flesh out the specifics of the fraud claim, including the nature of the misrepresentations and their detrimental reliance as well as any damages suffered.

*thal*, 62 A.D.2d 319, 322–23, 405 N.Y.S.2d 62, 64–65 (1st Dept 1978).

The basis for plaintiff's *prima facie* tort claim is somewhat unclear, and to some degree the cause of action suffers from multiple shortcomings. If plaintiff's *prima facie* tort claim is based upon the same circumstances as those alleged in support of their fraud claim, then it plainly is subject to dismissal on the basis that it merely seeks to replicate what, in defendants' view, is an insufficient fraud claim. If, on the other hand, plaintiffs are contending that it is based upon the entry into legitimate agreements, including the option agreement and notes, for illegitimate purposes, while it may withstand scrutiny under the other prongs of the test it must fail based upon the plaintiff's failure to either allege or to demonstrate a response to defendants' motion for summary judgment that it has suffered special damages. *See, e.g., Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 142–43, 480 N.E.2d 349, 355, 490 N.Y.S.2d 735, 741 (1985); *Del Vecchio v. Nelson*, 2002 N.Y. Slip Op. 08937, 2002 WL 31716371, at *1, 751 N.Y.S.2d 290, 290–91 (2d Dept. Dec.2, 2002).

Because plaintiff's *prima facie* tort claim is deficient as a matter of law, defendants are entitled to summary judgment dismissing that cause of action.

### F. *Quasi Contract, Quantum Meruit And Unjust Enrichment*

Plaintiff's fifth claim for relief seeks recovery under theories of quasi contract and quantum meruit. Complaint (Dkt. No. 1) ¶¶ 107–14. Their sixth claim for relief alleges unjust enrichment. *Id.* ¶¶ 115–18. Defendants also request the entry of summary judgment dismissing those claims.

The common theme underlying plaintiffs' fifth and sixth causes of action is the assertion that by acting in reliance upon defendants' continued assurances that they were purchasing WWBI, plaintiffs have been damaged. In support of this contention plaintiffs cite their investment of money into the infrastructure of the station, at the defendants' urging, and maintain that by making those expenditures they suffered the loss of investment opportunities in connection with that money. Plaintiffs also contend that they were goaded into borrowing money from the defendants to fund the unwanted improvements, thereby incurring unnecessary debt which they found difficult to repay. Plaintiffs argue that the requirement that they repay the loans evidenced by the promissory notes would result in unjust enrichment to the defendants.

The elements of quasi contract, quantum meruit, and unjust enrichment—all equitable in origin—involve the same concept, revolving around and dependent upon

> [a]n obligation imposed by law because of the conduct of the parties, or some special relationship between them, or because one of them would otherwise be unjustly enriched . . . [a]n implied-in-law contract is not actually a contract, but instead a remedy that allows the plaintiff to recover a benefit conferred on the defendant.

Black's Law Dictionary, at 332. Under New York law the precise definition of quantum meruit requires a showing of 1) the performance of services in good faith; 2) acceptance of services by the person to whom they were rendered; 3) the expectation of compensation for those services; and 4) reasonable value of the services. *Freedman v. Pearlman*, 271 A.D.2d 301, 304, 706 N.Y.S.2d 405, 408 (1st Dept.2000). To show unjust enrichment, plaintiffs must show that they conferred a benefit upon the defendants without adequate compensation. *Nakamura v. Fujii*, 253 A.D.2d

387, 390, 677 N.Y.S.2d 113, 116 (1st Dept. 1998). Unjust enrichment is defined under New York law to include retention of a benefit conferred by another, without compensation, under circumstances where compensation would reasonably be expected or, put another way, as a benefit received and not intended as a gift for which restitution or compensation should be made. Black's Law Dictionary, at 1536; *see also Estate of Argersinger*, 168 A.D.2d 757, 758, 564 N.Y.S.2d 214, 215 (3d Dept. 1990).

■ In opposition to these various equitably-grounded claims defendants assert that these claims are inconsistent with the existence of express contracts governing the subject matter at issue. *See* Defendants' Memorandum (Dkt. No. 30) at 19–22. It is well established, as defendants have asserted, that the existence of express written agreements under some circumstances can preclude recovery under quantum meruit, unjust enrichment, and quasi contract theories. *Theatre Row Phase II Assocs. v. National Recording Studios, Inc.*, 291 A.D.2d 172, 175, 739 N.Y.S.2d 671, 673 (1st Dept.2002); *see also In re Bayles*, 193 A.D. 473, 474, 184 N.Y.S. 273, 273–74 (2d Dept.1920). To preclude an equitable quasi contract claim, however, the underlying express contract must be a *valid* contract; in other words, a plaintiff is not precluded from asserting a claim in quantum meruit, unjust enrichment, and quasi contract if it is alleged that the underlying contract is invalidated by fraud or otherwise unenforceable. *See, e.g., Taylor & Jennings, Inc. v. Bellino Bros. Construction Co., Inc.*, 106 A.D.2d 779, 780, 483 N.Y.S.2d 813, 815 (3st Dept.1984); *Waldman v. Englishtown Sportswear, Ltd.*, 92 A.D.2d 833, 836, 460 N.Y.S.2d 552, 556 (1st Dept.1983). For this reason, since plaintiffs now claim that the underlying contract was fraudulently induced, I reject defendants' summary judgment motion seeking dismissal of these equitable claims.

### G. *Bad Faith*

In their seventh claim for relief the plaintiffs allege, in extremely conclusory and non-specific fashion, that they should recover against the defendants because they have acted in bad faith. Complaint (Dkt. No. 1) ¶¶ 119–21. This claim is apparently asserted as a basis for the request that the court enjoin enforcement of the promissory notes. *Id.* Defendants also seek summary judgment dismissing this cause of action.

■ Plaintiffs have not cited, nor have I found, any case suggesting the existence of an independent cause of action under New York law for "bad faith." Since plaintiffs' seventh cause of action is legally unrecognizable as a matter of law, I am granting defendants' motion for summary judgment dismissing that claim.

### H. *Personal Involvement*

In their motion defendants have also requested the court's assistance in narrowing the focus of the claims further by dismissing from the suit parties having no involvement in the conduct at issue. In their motion, defendants question the involvement of five of the named defendants.

#### 1. *Note Claims*

The appropriate parties to the note claims which, it has been determined, will survive summary judgment are Max Media, Max Management, and Max Advisors, as the potential holders of those instruments, and WWBI TV, Gary and Susan Clarke, and SMC, as the obligors under all or (in SMC'S case) most of those instruments.

### 2. *Fraud*

Plaintiff's allegations of fraud grow out of representations made by defendants Loving and Trinder. While those defendants have asserted entitlement to dismissal for lack of personal involvement, they are appropriately named as defendants in plaintiffs' fraud claim.

■ Although an individual defendant corporate officer is ordinarily protected from personal liability for the torts of his or her corporation asserted simply on the basis of his or her authority, a principal can still be held individually liable for fraud if he or she personally participated in, or had actual knowledge of, the fraud. *In re Macmillan, Inc.*, 204 B.R. 378, 404–05 (S.D.N.Y.1997). Personal liability will be imposed on corporate officers who commit or participate in torts, even if commission of or participation in those torts is for the corporation's benefit.[17] *Id.; see also Faulk v. Milton*, 25 A.D.2d 314, 316, 268 N.Y.S.2d 844, 847 (1st Dept. 1966). Since plaintiffs' allegations of fraud survive summary judgment, based on plaintiffs' allegations specifically naming Loving and Trinder as the parties who made material representations both they and the corporate entities on whose behalf they were acting—with the exception of Max Holding and Max Television Co., who are subject to dismissal on other bases—are subject to plaintiffs' fraud claims.[18]

### I. *Summary*

To summarize, having now reviewed the various direct claims of the parties in the context of the pending cross-motions, I have found the existence of triable issues of material fact precluding the entry of summary judgment on the defendants' note claims, in light of the fact that they could be found to be the product of fraud in the inducement and are potentially non-assignable. Those claims are properly asserted by defendants Max Media, Max Management and Max Advisors. I have also found summary judgment at this juncture to be inappropriate as to plaintiffs' fraud claim which is properly asserted against defendants Loving, Trinder, Max Media, Max Management and Max Advisors, and to plaintiffs' quasi contract, *quantum meruit*, and unjust enrichment claims properly asserted against Max Media, Max Management, and Max Advisors. The balance of plaintiffs' claims in this action, however, are subject to dismissal as a matter of law.

### J. *Motion For Leave To Amend*

As part of their response to defendants' motions plaintiffs seek leave to assert, in defense of the note counterclaims and third-party claims against SMC, various defenses, most of which have previously been raised affirmatively by the plaintiffs in their complaint. Defendants oppose that motion largely on the basis of futility, arguing that the defenses which the plain-

---

**17.** This is separate and apart from plaintiffs' "corporate veil" argument in which they assert that the Max entities are "alter egos" for defendants Loving and Trinder, giving rise to their personal liability. I specifically reject plaintiffs' alter ego theory, based upon the lack of any specific factual allegations tending to support that claim.

**18.** Specifically, Max Holding, which is named only in the caption of the complaint and not

in its body, is entitled to dismissal on the basis of its own lack of personal involvement. Similarly, Max Television Co., which is sued erroneously as Max Television, Inc., is entitled to dismissal based upon a lack of evidence in the record that it is either a successor in interest to Max Advisors or Max Media or in any way involved in the transactions in this case.

tiffs seek to add are facially lacking in merit.

■ Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure, which provides, in pertinent part, that "leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be freely granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed amended pleading, or futility. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Elma R.T. v. Landesmann Int'l Mktg. Corp.*, No. 98–CIV.3662, 2000 WL 297197, at *3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman*).

The defenses which plaintiffs and SMC have attempted to interpose by way of amended pleading include failure to state a claim upon which relief may be granted; fraud; accord and satisfaction; release; fraud in the inducement; *prima facie* tort; breach of contract; quasi contract; implied contract; *quantum merit;* unjust enrichment; bad faith; and unconscionability. Plaintiff's Exhibits (Dkt. No. 57) Exh. 17 ¶¶ 36–87. Except as relates to the first affirmative defense, which is non-controversial, defendants assert that the new affirmative defenses lack merit and that plaintiffs' motion should therefore be denied on the basis of futility.

■ In considering whether to grant a motion for leave to amend, the court may properly take into account the futility associated with the newly-added claims or defenses. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230; *Lucente,* 310 F.3d at 258. Quite sensibly, a court may properly deny leave to amend when the claim or defense sought to be added would not withstand a likely motion to dismiss for failure to state a legally cognizable claim or defense. *Lucente,* 310 F.3d at 259. Accordingly, in ruling upon the motion I must address the facial validity of the defenses which plaintiffs now propose to interject into the action.

Plaintiffs' second proposed affirmative defense pleads fraud, while the fourth asserts fraud in the inducement. It appears, however, that the gist of both claims is the same: that plaintiffs were fraudulently induced to give the promissory notes, and that the defendants are therefore precluded on that basis from seeking recovery of the monies advanced. As previously indicated, the question of fraud in the inducement is heavily dependent upon intent of the parties, a question which at this early juncture is not appropriately decided on motion for summary judgment, particularly in the absence of meaningful opportunity to engage in pretrial discovery. In light of this, I cannot find as a matter of law that this defense is futile, and therefore will permit plaintiffs to assert one, although not two, fraud in the inducement defenses.

By the same token, I have already concluded as a matter of law that plaintiffs have failed to establish accord and satisfaction, release, *prima facie* tort and unconscionability. Based upon that finding I conclude that those claims, which could potentially establish a defense to a breach of contract claim by the defendants, are deficient, and I therefore deny leave to amend to assert plaintiffs' third, eighth and ninth affirmative defenses on the basis of futility. The remaining affirmative defenses, including breach of contract (sixth affirmative defense) as well as quasi contract, implied contract and quantum meruit (seventh cause of action) assert affirmative claims for which relief is sought by the plaintiffs. These claims do not represent cognizable defenses to a breach of contract claim; rather, any establishment of such a cause of action coupled with a showing of damages would allow for an offset against

any recovery by the defendants against plaintiff SMC based upon breach of contract. *See* 34 New York Jurisprudence 2d Pleading § 177 (November 2002) (counterclaim, as opposed to an affirmative defense, can stand on its own as a separate action); *see also, e.g., Camp Kennybrook Inc. v. Kuller,* 214 A.D.2d 264, 266–67, 632 N.Y.S.2d 874, 875–76 (3d Dept.1995) (claims sounding in tort should be plead as a counterclaim, not a defense to a breach of contract claim). As such, those claims are not appropriately asserted as affirmative defenses, and I deny plaintiffs' motion to add those claims on the basis of futility.

## IV. *SUMMARY AND ORDER*

This action, which as indicated at the outset results from a contemplated commercial asset purchase ultimately not consummated, presents a host of diverse and at least partially contradictory claims against a panoply of parties. The motions now pending before the court have been exhaustively briefed. When parsed down, however, and put to the test of motions for summary judgment, it is clear that the only viable claims in the action include plaintiffs' claims of fraud against defendants Loving, Trinder, Max Media, Max Management and Max Advisors; plaintiffs' claims of quasi contract, *quantum meruit* and unjust enrichment against Max Media, Max Management and Max Advisors; and the counterclaims and third-party claims of Max Media, Max Management and Max Advisors against the plaintiffs and SMC based upon the promissory notes given, subject to the defense of fraud in the inducement. As to these claims, there exist genuine issues of material fact precluding the entry of summary judgment, particularly given that the plaintiffs have not yet had the benefit of pretrial discovery. The remaining claims and defenses, however, must yield and are subject to dismissal as a matter of law.

Based upon the foregoing, it is hereby

ORDERED as follows:

1) Defendants' motion for summary judgment dismissing plaintiffs' complaint (Dkt. No. 29–1) is GRANTED with regard to all claims except plaintiffs' fraud causes of action against A. Eugene Loving, John A. Trinder, Max Media, Max Management and Max Advisors (first and second claims for relief); quasi contract and *quantum meruit* cause of action against Max Media, Max Management and Max Advisors (fifth claim for relief) and unjust enrichment cause of action against defendants Max Media, Max Management and Max Advisors (sixth claim for relief). As to those claims, I find the existence of genuine issues of material fact requiring trial and precluding the entry of summary judgment;

2) Defendants' motion for summary judgment on their third-party claims against defendant SMC (Dkt. No. 41–1) is DENIED, based upon my finding of the existence of genuine issues of material fact as to whether the notes were the result of fraud in the inducement, and whether they were properly assigned by the original holder to Max Advisors without consent;

3) Defendants' motion for summary judgment on their counterclaims against the plaintiffs (Dkt. No. 48–1) is DENIED in part, the court finding the existence of genuine issues of material fact as to whether the notes were the result of fraud in the inducement, and whether they were properly assigned by the original holder to Max Advisors without consent;

4) Plaintiffs' cross-motion for leave to amend (Dkt. No. 63–1) is GRANTED in part to allow the inclusion of a fraud in the inducement defense, but is otherwise DENIED on the basis of futility;

5) Plaintiffs' cross-motion for summary judgment in their favor on their breach of contract claim (Dkt. No. 63–1) is DE-NIED; and

6) The clerk is directed to promptly forward copies of this decision and order to counsel for the parties by first class mail.